Our second case for today is Tabb v. Christianson, and when you're ready, we'll hear from you Mr. Reynolds. Mr. Reynolds, you're making me think we need a different kind of podium that will accommodate laptops better. I'm doing my best, but I think I'll survive. May it please the court, this is a case not about a legal technicality. This is a case about a true injustice. Petitioner appellant Triandus Tabb was convicted of a crime that two of his housemates committed. We know this because business records of the group home where the three of them lived state affirmatively that Triandus Tabb was the only one in the home when the shootings occurred. And they state affirmatively that the two assailants were not in the group home at the time. An off-duty police officer who was an eyewitness to the event positively ID'd the other two group home members as both the shooter and as the getaway driver. Are we sure that this group home keeps such accurate tabs on its residents, excuse the term, keeps such accurate records of where its residents are at the moment that we can rely on that? I mean, that's the obvious explanation that if Triandus Tabb slips out without anybody noticing, then he could have been where eventually Mr. Salvador Gomez says he was. Sure. As a note, this is background for the case, it's not the basis for our claim. We don't have a stand-alone actual innocence claim. But during the trial, the accuracy of the records was tested. Now, a couple of inconsistencies were pointed out. One, in a related document, a census form, somebody marked in the house on the wrong line. So it was a line by the letter S for school. So they marked it on the wrong line. Whereas in the logbook, it explicitly states who was in the home, when they woke up, what they're doing, when they're in the home, when they asked for us to leave, when they leave. And there was another inconsistency in that there was no record of when one of the individuals returned. That was during a shift change. But there's absolutely nothing in the record that indicates or gives any reason to believe that an affirmative statement kept in this business record would have been wrong. And this logbook was kept under lock and key, away from the group home members. And there's testimony throughout the trial that they couldn't leave. There was an alarm on the back door. The attendant always watched the front door. There were bars on the windows. These guys couldn't have left without the record. So here's what concerns me about your theory. To the extent that you're looking at the lineup, and to the extent that I understand it as a Brady claim, that there's somehow some exculpatory evidence, either in the sense of impeaching or in the sense of, it's really impeaching evidence. That's fine for Brady. But I'm having trouble figuring out what exactly it is you think that he didn't know about. That didn't come in at the trial because the prosecution failed in its Brady obligations. That should have come in. Two pieces. One, information. What happened at the lineup. The fact that before the lineup occurred, a photo, a large zoomed-in picture of Triana's tab, which is located nowhere in the record, has never been produced. It's not used for any other reason. It was just there on the night of the lineup. Happened to be within clear view of the victim. And who was going to testify to this that was not known to the defense? I mean, how are we going to find out about this photo? I'm imagining, okay, now a new perfect trial is happening. What happens? The state discloses, the prosecution discloses, here's this photo. And it discloses the information related to the lineup. One, there is this photo that was right within the purview of the victim. And then, number two, after the lineup, the detective confirmed, hey, you picked the right guy, and here's the photo. Is that, wait a second, that seems like the version of the facts that's most favorable to Mr. Tabb in this case. But Nellie Gomez's testimony about those points, and I assume she's the one who would have to testify about these matters, both the photo and the supposed confirmation. When she's asked about it at the post-conviction testimony, it's not nearly as effective for Mr. Tabb. I'd like to be very clear, Your Honor. My recitations of the facts are uncontested. The contested portion is whether Salvador saw the photo. Nellie told the defense she did, said that the photo was there. Then she recanted all that testimony and marked her email. But at the hearing, she said again that that photo was there and that she was with her. But if the photo was there and he never saw it, then why does it make a difference to the reliability of his ID at the lineup? Two points on response. There's no evidence that he never saw it. There's strong circumstantial evidence that he did, especially with the deposition testimony of Nellie Gomez. He was standing right behind her when she saw the photo and she could see every detail of it. She knew it went from the collarbones up. She was sitting in a chair. He was behind her. That's uncontested. She's never recanted that testimony. She talks all about these cubicles and everything. I mean, it's not – it sounds like you're trying to get this Brady point across based on something that requires a couple of layers of speculation. And that's what worries me about it. Well, that gets to my second point. Did he see it? If he saw it? That kind of thing. That gets to my second point. My first point, there's strong circumstantial evidence that he saw it. This court has said when you analyze the strength of the case, circumstantial evidence is no different than direct evidence. Second point, the impeachment. You cannot reconcile the failure to turn over this photo with this court's opinion in Newsom v. McCain. This court analyzed, one, the fact that eyewitness testimony is not always reliable. But then once a conviction is formed, even if it's incorrect, it's impossible to shake. And that was the same issue as there. And Justice Easterbrook, I believe, authored the opinion and said, look, the problem here is not with the suggestibility of the lineup. The problem here is you didn't tell anybody about it. That's the problem. This photo can impeach the entire lineup. And this is where Strickler comes in. If he saw it, right? Even if he didn't see it. Why does it hurt anything if he didn't see it? I mean, if he didn't see it, then he just picks out whoever he thinks from the lineup. And then there's a trial. And we all are quite familiar with the literature. I mean, once somebody's settled on something, they tend to stick with that. But you can't do much about that. The photo is relevant only if he saw it. Respectfully, Your Honor, I disagree. There is the photo, but there's also the fact that the detective confirmed for him that he selected the right individual. It could also impeach the two detectives. Okay. In your brief, frankly, as I was reading along, I saw your assertion that the detective confirmed his choice. And, you know, alarm bells go off, okay? That would be outrageous if it happened. And what's the evidence that it happened, particularly in light of Mrs. Gomez's testimony of the post-conviction hearing? At the post-conviction hearing and in her deposition, she says, I was standing there with my husband. He was in shock mode. He wasn't really saying anything. I asked the detective, can you show me who hurt my husband? And he goes, oh, here's this photo. And he shows it. That doesn't say you got the right guy, right? Wait, if she asks the detective who hurt my husband and he grabs a photo and shows it to her? Well, if the detective says this is the guy he just identified, that simply tells her she's not going to be a witness, but it tells her what the results were. It's very different from the police officer telling the victim witness, you got the right guy. So our position is that that's a misrepresentation of the record that's in the state's brief, because she very clearly asked him to identify who hurt her husband or who shot her husband. She did not ask the detective. If you read her deposition testimony and her post-conviction hearing testimony, it's very clear she did not ask who did my husband identify. She asked, can you tell me who hurt my husband? That's what she asked. I think it's very important to focus on the pitching part, because this is the problem. There are all these issues with eyewitness identification. Seven weeks after the guy got shot three times and spent the night in the hospital. The problem the jury has is how in the world, what a coincidence. There's a reason to believe it might not be reliable, but he identified the guy who happened to live in the group home with these other kids. The mere existence of this photo gives the jury another reasonable inference. There's no way they could have drawn without it. And that is exactly the Brady standard that, is it Strickler, that casts the whole case in a new light. Does the record reflect, by the way, I've been assuming this, but let me just ask you what the race of Pittard and Brown is? Are they also young African-American? I believe that that's correct, Your Honor. Just by looking at the black and white photos, I believe that they're correct. Also, as this court pointed out in Newsom McCabe, it's very difficult when you don't even know the guy. There are a plethora of factors that make these eyewitness identifications, and I cannot stress enough that the juries make decisions by stories. They analyze cases under all the facts, and that's what the Strickler standard says. It says here's this new inference, here's the new light you cast on this case. How did this guy happen to identify Mr. Tab? Well, I agree with you on one thing, which is that the identification by Mr. Gomez of Tab as the assailant is critical to the case. It does seem, and the state says that in their presentations at the trial, so it is a very pivotal point. I'm just trying to figure out whether there's enough here to say that the state courts are wrong, that there's no Brady problem. First of all, the state courts weren't wrong because this issue was never raised before. The district judge here, Judge Dara, finds that you've overcome the procedural default. That, of course, immediately calls to mind. Correct. I see that I've entered my rebuttal time. If you'd like to save your response, you can do that. Absolutely. Thank you, Your Honor. Okay, sure. Ms. O'Connell. Please, the court, I'm Assistant Attorney General on behalf of the respondent. I'd like to start where opposing counsel left off, and that is that this Brady claim, in addition to being meritless, is clearly procedurally defaulted. But the district judge found that the default was excused, and so maybe that's where you really should start. Yes, and this court's review is de novo on the issue of whether he has shown cause and prejudice to overcome the default. The district court seemed to be mistaken about the timing of his discovery of the issue and his attempts to raise it in state court. It was before the evidentiary hearing in his post-conviction proceeding that he spoke to Nelly Gomez, and his investigator allegedly heard this exculpatory information about the lineup. He did not at that point, as he could have, move to amend his post-conviction petition to add a Brady claim. He only relied on Nelly Gomez to support his state law claim of actual innocence. So that was his first default. But he didn't raise it at the Illinois appellate court level either. He waited until his PLA in the Illinois Supreme Court to even mention the word Brady. And the district court's finding of cause was that this was basically something he couldn't have learned about before he talked to Nelly Gomez. Well, until Nelly allegedly informed the investigators. He says petitioner is excused from his procedural default as he was unaware of the possible claim until Nelly spoke up, basically. Correct. And that would explain his failure to raise it in his original post-conviction petition. What it doesn't explain is his failure to attempt to amend the petition in the trial court to raise the issue. And it doesn't explain his failure to raise it to the intermediate appellate court on his appeal and the post-conviction proceeding. So the cause has to refer to some external impediment that prevented him from raising his claim in the appropriate manner. His inability to know the facts supposedly of this tainted lineup were known to him earlier than he first attempted to raise it in the state court. And it's a little bit unclear even from his reply brief as to what he's relying on in this court as cause for his default. As noted, the district court relied on the fact that he didn't know that Nelly Gomez had this information. He doesn't argue that. But why would he think Nelly Gomez had any testimony? Anyway, she wasn't there. That's correct. I mean, I don't see that as a lack of diligence unless you think there's some duty to just go scour the world every time there's a problem. No, and I believe that that would explain his failure to raise it until he spoke to Nelly Gomez. There was no reason for him to think that she had information pertaining to the lineup. And my understanding of the way things unfolded is that he didn't specifically approach Nelly Gomez and ask about the lineup. He was trying to contact Salvador Gomez, and Nelly Gomez was the go-between. And she at one point talked about this moment that she had with seeing a picture of Petitioner after the lineup or in the room while her husband was viewing the lineup. She volunteered that information to him, and at that point he began to pursue it. But he could at that point have raised it at two levels of state review, and he made no attempt to do that. And just to come back to the issue of whether he's alleged the impediment in this court, as is his burden to do, in his reply brief he basically says, the circumstances that explain my failure to raise it in state court continue to this day. On page 24 of his reply brief he says, there is no after in this case. Well, it's clear he can raise his claim now, and he raised it in the district court, and he's raising it here. Whatever factors he's citing do not explain why he didn't raise it as he was required to in the state court to give the state courts the first opportunity to resolve the Brady claim. And another fact I'd like to mention on the Brady claim is Nellie Gomez provides very indirect information about the supposed tainting of the lineup. Now, of course, at one point it's more helpful than later, right? Her first account, which she backs off from, is that the couple are standing there and they can see this big picture. And, of course, we know how suggestive lineups can be, and people are, you know, capable of being influenced by things like that. It's a real problem that he certainly could have used to impeach the lineup. Whether the jury bought it as good impeaching evidence or not is not for us to decide, but it certainly would have been great impeaching evidence. Well, just to clarify what Nellie Gomez said, the helpful version of her testimony is given by a petitioner's investigator, so it's hearsay. Nellie has twice now in both state court evidentiary hearing and discovery here denied that she told the investigator that her husband could have seen the picture from where he was. But if there had been the proper disclosure to Mr. Tabb, he could have dug down below those levels of hearsay and found out, you know, whether she was being influenced by the state. You know, she could have gotten to the bottom of it and come up with a non-hearsay version. That's correct, and I have a couple of responses to that. The first is that to dig down to the bottom of this issue, he needed to approach Salvador Gomez, who's the only person that can state definitively whether he saw the picture before the lineup and whether it influenced his identification. Well, Nellie could say, we were both standing there and a picture was in front of us. I mean, you know, you can get circumstantial evidence in that he must have seen it. I wouldn't necessarily dispute that it would be admissible. The question is whether this information is material and exculpatory for purposes of Brady. Oh, I wouldn't push on that. I mean, I can see, it seems to me it's quite, if it could come in, if we knew that Salvador Gomez had seen this, you know, 8 1⁄2 by 11 headshot of Mr. Tabb in the context of the lineup, it seems to me most defense attorneys would surely want to use that as evidence that the lineup was unduly suggestive. And absolutely, if we knew that Salvador Gomez was exposed to the photograph, that would be important information. But we don't know that at this point. The only evidence he has mustered through Nellie Gomez suggests that he did not see the photo. Salvador Gomez has been available at the time of his post-conviction proceeding and today, and he's still not come forward with any information from Salvador. Is there any doubt as to whether Gomez saw the person who shot him? No, Your Honor. And that was another point I'd like to get to, which is that his identification is reliable notwithstanding any exposure that he may have had to this photo. As the court noted in Neal v. Biggers, suggestive lineups are a problem. But they don't necessarily mean that a lineup is irreparably tainted. The petitioner doesn't have to show the lineup was inadmissible. The petitioner has to have simply evidence he could use to argue that it was unreliable, right? Correct. But was it Detective Cepeda who supposedly was with the couple at this time? Is that right? He is the one that took Salvador to the lineup and brought him back. So what's his version of this concerning the photo? He's never been asked. That's another person who would know direct information, and he hasn't been approached. Even considering that Nelly Gomez gave unhelpful information in the state evidentiary hearing, when he sought discovery in the district court, he didn't seek to talk to Cepeda. He didn't seek to depose Salvador Gomez. These are the people who could provide information that would show whether the lineup was tainted. But it's important in evaluating the value of this information that Gomez's identification was based on several minutes of face-to-face contact with the petitioner in broad daylight. Seconds? Minutes? We don't know, right? There's some dispute, but the officer Milo Cadishon, whom the petitioner argues is a reliable witness, testified that it was Salvador. Is there any doubt that Gomez saw his assailant from a very close range? No, there was no dispute about that. Because he forced his arm down, right? Correct. That was holding the gun, otherwise he would have been killed. Correct. So he must have been only a foot or so away. Right, that's what he testified. And, again, the officer confirmed all of that, too, including that Salvador had a much better view, whereas the officer saw only the profile. Obviously, they were face-to-face at the time they were struggling over the gun. My understanding is that Mr. Tabb is arguing that cross-racial identifications are unreliable if you look at the empirical evidence. That's why I asked about the race of Mr. Pittard and Mr. Brown and how much they either did or didn't resemble Mr. Tabb. I think the statistics show that... What other races were we talking about here? Hispanic and African American. Correct. I think that there is research that shows that a misidentification is more likely under those circumstances, but it doesn't show that a person is unable to positively ID someone of the opposite race. No, no, I don't understand. To say he's absolutely unable, but the reliability goes down. Somewhat. And, here, too, the officer, again, on whom petitioners were relying as the most reliable witness who provided evidence of his innocence, was also making a cross-racial identification, and, again, from a much greater distance of 100 feet over multiple lanes of traffic. So, to the extent that the cross-racial identification is an issue, it affects both of these. So, what did the state do with these logs showing that, actually, Tabb is in the house the whole time that this is all happening? So, we know that the logs are unreliable because they failed to note on the very day of the shooting when Pittard returned to the group home. So, in the record at 826 to 827, it reflects that a new individual came on shift at 4 o'clock p.m. and noted at that time that Pittard was in the residence. There was no entry from the individual who had been keeping the records that were supposedly reliable that Pittard had ever returned. And we also have reason to suspect that it was inaccurate the way each of these individuals was leaving 15 minutes apart because both Brown and Pittard have testified at various points that the three boys left together. So, that appears to be incorrect as well. Ms. O'Connell, let me ask you about one of the legal points you've asked us to address, is whether a youngblood claim for destruction of exculpatory evidence or potentially exculpatory evidence is even viable if the destruction occurs in connection with a post-conviction proceeding. Correct. I've got to say, I'm very troubled by that argument. And let me just ask you, the extreme case, let's suppose, which has happened on occasion, new blood or other DNA evidence is discovered that clearly has potential to exculpate a defendant who's challenging his conviction, and the police decide, no, we think we've got the wrong guy, so we're just going to destroy this. I do understand the court's concern. And let me also ask you to keep in mind the Supreme Court's decisions in Martinez and Trevino, which make pretty clear that under some circumstances there is a constitutional right to pursue post-conviction relief, at least if what you're challenging is a constitutional violation in your original trial, where you need additional evidence in those cases of ineffective assistance of counsel. But it would also include concealed exculpatory evidence, I would think. I have a couple of responses, I guess. Martinez and Trevino I don't read as giving a constitutional right to PC review in state court. They excuse a petitioner's failure to do so at his first opportunity, but what they recognize is that... They give you an opportunity. They say if you didn't get it in state court, then we'll give it to you in federal court. Exactly. But... They recognize that you should have at least one opportunity to pursue an issue that... Right, which is a long way from saying that there's no right at all because of the rights in federal court. I mean, if your position means that you get to destroy that inconvenient DNA evidence whenever you feel like it, as long as you wait until post-conviction, that's an alarming proposition. People could die over it. I do have a couple of responses. Our first argument is not that there is no constitutional right necessarily. It's that this is not a cognizable claim for habeas relief. All of the cases that he has cited are brought in the 1983 context. For example, the Osborne case by the Supreme Court considered in 1983 remedy. But that line doesn't make me feel too good because if what they're... Suppose somebody's challenging a life sentence, which is a duration. You don't get to 1983 until you've gotten the sentence vacated, right? Exactly. That's a durational. Under Pryor v. Rodriguez, that's a durational thing. You're like, well, first die, which is the end of your life sentence, and then your estate can bring the 1983 case? That's not too great. I do understand the court's concern with the more extreme circumstance, but I would remind... So your theory has to accommodate that. It does, and I think those would present more difficult issues. Why don't you just say there is a right? There is a right to due process. When a state court makes a post-conviction remedy available, it does have to comply with procedural due process. I think that's been established. That's absolutely true, yes. The question is where the petitioner can pursue the remedy. Again, the position we've taken is that this is under the circumstances here. Habeas is not the remedy. But I would take a step back in this case and note that because the claim was adjudicated, the real issue before the court is whether this was clearly established precedent under 2254D. So just to make clear, we're talking... Wait a second. Whether the applicability of young blood to PCR is clearly established or whether the defendant has a clearly established constitutional right not to have exculpatory evidence destroyed. The young blood requirement of retaining notes that were first created in a state post-conviction proceeding is not clearly established. That's the argument. Okay, thanks. And, of course, the court does have to very specifically, not identical circumstances, but address the issue for purposes of 2254D. But the court, more importantly, even assuming that young blood applies to notes created in the post-conviction context, the court reasonably held both the state appellate court reasonably held that there was no bad faith in the destruction of the notes and that there was nothing exculpatory in them. And then the district court also correctly held, based on the discovery information, that, again, petitioner had failed to prove either point, that there was any information in the notes that was not in the report. And so we would ask the court to affirm the judgment below. All right. Thank you very much. You have a little bit of time, Mr. Reynolds. Your Honor, the first district appellate court recognized the impeaching value of the existence of this photo. I just want to be very clear on our position. Now, what are you asking for? So this assault took place in 2003? Correct. 13 years, 14 years, well, almost 14 years ago. What do you want, a new trial? No, Your Honor. At this amount of time, at this juncture, after 14 years, I think that this court should vacate the image. You want an acquittal. Is that what you want? A vacation. You want to end the thing and no guilt for your client. Absolutely. No retrial. Absolutely. I mean, at this point, a retrial would be ineffectual. And also, due to the State's affirmative actions here, we still have never seen the photo. You know, what distinguishes this case from a lot of the cases in which this court even found calls for retrial? I'll tell you what my difficulty with your case is. You have a situation in which the assailant, the assailant couldn't have been more than a foot away from the victim, right? Otherwise, the victim could not have knocked his arm down, which was critical. Otherwise, he'd be killed. So they were very, very close. I don't care whether they're different races, different species or what, but I think you've seen a foot away a person trying to kill you and then he shoots you. I don't think you ever forget that face. I absolutely would love to respond to that point. Two points. First of all, his description of the assailant at trial was tall guy, black guy, kind of skinny. The exact same description. That's at the record 3914. It's the exact same description that Officer Gadishon gave. Not very detailed. What did Salvador remember about that day? Didn't remember what he was wearing. He didn't remember whether the incident lasted, I think he said 10 seconds to 3 minutes, maybe 5 minutes. There may have even been 10 minutes in there. That's around. Didn't remember what he was wearing. It's at 3935. The court below recognized he had smoked. I don't know why he didn't remember what the guy was wearing. I would think he remembered that face. He didn't know what he was wearing. He saw that face again, the face of the person who tried to murder him. Sure. He didn't remember whether he saw photos in the hospital that day. The face would have been on the photos. He didn't remember anything. This is seven weeks after the shot. He didn't remember whether he saw photos the day of the shooting? Yeah, at the hospital. He didn't remember. I wouldn't be surprised by that at all. I'm sorry? I don't find that surprising at all. Okay. So he doesn't remember whether police came to show him photos. He doesn't remember what he was wearing. He doesn't remember whether this thing lasted 10 seconds or 5 minutes. But he remembers how to distinguish two individuals that record shows, Trandis Tabb and Norman Brown, who look. So there's a phenomenon of temporary amnesia from shocking events, and maybe the memory didn't imprint. That's exactly what this court analyzed in the Newsom v. McCabe opinion. Eyewitness identification is drastically overrated, especially when you don't know somebody. In a short context like this, from the very beginning, the police were looking for Petard and Brown. And if you'll allow me to editorialize, I know where this case went off the tracks is when they did the first lineup with Petard and Brown. Well, there must be. There must be a literature on this. There is literature. Recollection of assailants and so on. So was there evidence presented about that? We attempted to introduce below. Pardon? We attempted to introduce in the post-conviction hearing. No, I'm talking about the original trial. I don't believe there was. I mean, if there's an issue about what do you remember, what do you forget, I'm sure there is a literature on this subject. There is. Maybe if they're assaulted, they're too terrified, and they don't remember anything. Or maybe, as I think is somewhat more plausible, they never forget. And I would think it would help on a trial like this if there was evidence about recollection. Was there evidence, for example, about cross-racial identification? Or is this just something that's been talked about later? Your Honor, the evidence was not introduced at trial, but Salvador himself talked about what he didn't remember. And also, none of this really matters. If there's no way for the jury to conclude. I don't agree with you. It doesn't matter. That's why I'm asking you about it. It matters to me. It may not matter to you. Sure. There was none of that evidence introduced at trial, I believe, because they wanted to stay away from the ID. They had no way to explain it. Without this photo, there's no way to explain how he identified for us to have. I see them out of town. I would like to make one very, very brief point. All right. I'll make the default point. Nellie told a story, and then she recanted the whole thing when she talked to the investigators. She gave it back when she was testified at the post-conviction hearing. So we didn't have a chance to amend anything, because the hearing had started by the time she testified under oath and gave the facts back when she got away from the investigators. And that caused, we've cited the Banks case, that caused the Banks case to recognize that it's usually incumbent on the prosecution to fix their mistakes. They've never fixed their mistakes in this case, and that's what distinguishes it from a lot of other cases. Thank you, Your Honor. Thank you very much. I used to ask you something. Has he been in prison all this time? He was paroled, I believe, last year. He was what? Out on parole, still in the system. He's been paroled? For a year, about, right? About a year, I believe. So he's been a long time. Still in the system. All right. So thank you very much to both counsel. Your firm was recruited, I believe, to take this case. Is that right? That was a long time ago. All right. Well, we appreciate your efforts, and we appreciate those at the state as well. We'll take the case under advisement. Thank you.